[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff landlord and the defendants entered into a landlord-tenant relationship for premises ultimately known as the Waterfall Tavern in 1984; the most recent extension of the lease was to expire by its terms on December 31, 1995. During the first week of August, 1995, the defendant James DuMond, the president of the defendant corporation, spoke with Thomas Pedrotty, a vice president of the plaintiff, to tell him that the Waterfall Tavern was experiencing financial difficulties. In a telephone conversation on August 10, 1995, DuMond indicated that the defendant was not going to be able to pay the full amount of the rent from that point on and was intending to shut down the "a la carte" portion of its restaurant business. DuMond wanted to stay open for banquets and special occasions, at least while the parties might arrange for a new restaurant business to move in. DuMond faxed a letter to Pedrotty on August 11 which memorialized the substance of the phone conversation. DuMond suggested that his wife's catering business could cater the affairs which had already been booked over the next sixty days, "subject to [the plaintiff's] approval." If that proposal didn't meet with the plaintiff's approval, DuMond suggested at least leaving the CT Page 6375 restaurant with fixtures and furniture intact, to make it easier to market. Pedrotty had asked that DuMond reduce his thoughts to writing, so that Pedrotty could discuss the matter with others at the plaintiff's business. Under the terms of the lease, rent was due by no later that the tenth of the month.
Rent was not paid by August 10, and on the morning of August 11, the day after the telephone conversation and before anyone from the plaintiff had given a response to the defendant,[1]
employees of the plaintiff changed the locks to the premises and locked the defendant out. When employees of the defendant showed up in the morning, they had to get in through a loose window. One of the employees called DuMond to inform him of the turn of events; shortly afterward, DuMond received a faxed letter from Pedrotty, which said that Ensign-Bickford was rejecting the proposal to have special functions, and rather were "writing to propose" that Hop Brook immediately vacate the premises, leave the fixtures, account for the fixtures and equipment for evaluation. Ensign Bickford said that it had "secured the premises and rekeyed the exterior locks." Ensign Bickford concluded by stating that "if this proposal is acceptable", Hop Brook should sign the proposal and return it and that if the proposal were accepted, "we can avoid the necessity of eviction proceedings for possession of the premises."
Hop Brook did not agree to the proposal; on the other hand, as it had been effectively dispossessed, there apparently wasn't a need for eviction proceedings. The plaintiff did allow employees of the defendant access to the premises for the purpose of removing personal belongings and the like; DuMond scrambled with area restaurants and placed most, if not all, of the booked banquets with others.
The plaintiff initiated the instant action on October 18, 1995, to recover "rent" due for the last five months of the lease and for damages to the premises. The defendant answered the complaint and filed several special defenses. The first special defense alleges that because the landlord's alleged lockout was an unequivocal act terminating the lease, there was no further obligation to pay rent. The second defense alleges that because of the alleged lockout, no use and occupancy payments could be recovered for periods of time after the lockout. The third defense alleged a failure to mitigate damages; and the fourth alleged that because of the alleged lockout, the plaintiff is estopped from recovering rent or damages. The defendants also CT Page 6376 filed a counterclaim based on the alleged lockout.
The key to the controversy is the lockout. Had the plaintiff simply pursued the summary process eviction, there probably would be no controversy. Although the plaintiff claims that there was no lockout, its backup position is that contractual damages may be recovered even if there is a lockout. By its special defenses, the defendant claims ultimately that because of the lockout, the plaintiff is "estopped" from recovering any damages, and that it is entitled to damages of its own under the counterclaim.
I find that the allegations of the first count of the complaint are proven as to contractual liability. Read together, § §§ 4.1.A and 23.1.A of the lease provide that the tenant is in default if the base rent is not paid by the tenth of the month; it is not disputed that the rent was not so paid. Although the contract was breached at that point, the tenancy was not yet terminated. The exchange of proposals did not terminate the lease. See Tseka v. Scher, 135 Conn. 400 (1949). The plaintiff at that point could continue the tenancy and thereby continue the obligation of the tenant to pay "rent"; or, the plaintiff may opt to discontinue the tenancy. Rokalor, Inc. v. Connecticut EatingEnterprise, Inc., 18 Conn. App. 384, 388 (1989); K R RealtyAssociates v. Gagnon, 33 Conn. App. 815, 819 (1994). Termination of the tenancy occurs only by an unequivocal act; ordinarily, in these circumstances, the unequivocal act is a proper notice to quit. A lockout is, however, an unequivocal act for the purpose of terminating the tenancy. See, e.g., Daddona v. Liberty MobileHome Sales, 209 Conn. 243, 252-53 (1988). On the facts of this case, there can be little real dispute that a lockout occurred.[2]
Having terminated the lease, the plaintiff is technically not entitled to rent, as rent is only a payment pursuant to a lease. Feneck v. Nowakowski, 146 Conn. 434, 436 (1959); Rokalor,
supra, 388-89. As the restaurant had been locked out, the plaintiff was not entitled to use and occupancy payments. See, e.g., DiPaola v. Coppola, NH-622, CVNH 9309-6025 (Housing Session 1994) (Mintz, J.). The plaintiff may, however, be entitled to contractual damages proximately caused by the defendants' breach, subject, of course, to the duty to mitigate damages. Rokalor,
supra, 389-90; KR Realty, supra, 820-21.
The computation of damages on the first count of the CT Page 6377 complaint is, then, as follows. The plaintiff claims five months worth of rent and other payments pursuant to the lease. Pursuant to Exhibit 6, the total monthly rental payment was $5,643. Five months amounts to $28,215.00. The plaintiff produced evidence to the effect that five months worth of other charges, including taxes, insurance, sewer, grounds and snow removal amounted to $12,321.00. The sum is $40,536.00, before any reduction for failure to mitigate damages. As to mitigation, it is found that Ensign Bickford had the opportunity to allow Mr. DuMond's wife's company to cater events which were already booked, and that the defendant had offered to pay one third of the gross receipts to the plaintiff. Although the plaintiff correctly states that it was under no obligation to accept the proposal, the fact remains that it could have limited its damages to a degree. The defendant introduced evidence showing that approximately $48,000.00 in gross business had been booked through October 15, 1995, which is the period of time suggested by the defendant in Exhibit 4. I am deducting from the sum of $40,536.00 the landlord's share of the receipts, or $16,000.00. The damages awarded on the first count, then, are $24,536.00.
As to the second count, the plaintiff introduced a list of the damages it claims are due because of repairs that had to be made to the premises, utility payments, and so forth, as Exhibit 15, and introduced testimony about the items. I find that payment for the utilities, in the total amount of $3,332.00, is due from the defendant. As for the other items claimed, I find that the damages were either due to normal wear and tear, were the responsibility of the landlord under the lease, or were items which the defendant may have cured had it not been locked out. I do not find that the plaintiff sustained its burden of proof, then, as to the remainder of Exhibit 15. The total amount of damages on the complaint, except for attorney's fees, interest, costs and expenses, is $27,868.00.
We turn now to the defenses and counterclaim. The special defenses as to the duty to pay rent[3] and use and occupancy are discussed above, as is the issue of mitigation of damages. The fourth special defense alleges that the plaintiff is estopped from recovering damages because of the lockout. Although there may be some emotional appeal to denying damages altogether because of a lockout, I could find no authority to that effect. It is of course true that no damages for use and occupancy can be due when the lockout has occurred, and the lockout has made a difference in some of the claims involved in this case. I could CT Page 6378 find nothing to support the idea that a lockout can serve as a super trump card and have the effect of disposing of every other issue. The fourth special defense is, therefore, of no avail.
I turn, finally, to the counterclaim. The first count alleged a lockout, with damages as provided for § 47a-46 of the General Statutes; the second count has been withdrawn orally at trial; and the third count alleges an unfair trade practice in violation of § 42-110a et seq. of the General Statutes.
I find the allegations of the first count proved. As noted above, there quite clearly was a lockout. The defendant has argued that damages under § 47a-46 may not be awarded unless the action has been brought according to the procedures of §47a-43. Although in this case an action certainly could have been brought with the time limits of the latter section applicable, the fact that the defendants chose to assert the matter as a counterclaim does not undermine the ability to assert the substantive cause of action. See, e.g., DiPaola v. Coppola,
supra, where damages for lockout were brought pursuant to a counterclaim to a claim for "rental" type damages under a lease.
Damages pursuant to the first count are somewhat elusive. DuMond offered evidence to show that he had bookings in the amount of roughly $48,000 in the period of time to October 15, 1995. Profit might be conservatively estimated to be 10%, or $4,800.00. Had the lockout not occurred, however, it is perfectly conceivable that a notice to quit would have shortened the period of occupancy by a considerable amount. I find reasonable damages to be $2,000.00. I find the elements of § 47a-46 proved as to double damages, so that the total of damages awarded on the first count amounts to $4,000.00.
I also find the allegations of the third count proved. A lockout would seem to be very close to a per se unfair trade practice, and a number of cases have awarded damages under CUTPA in lockout situations. See Daddona v. Liberty Mobile Home Sales,
supra, 257; DiPaola v. Coppola, supra; Freeman v. Alamo, 24 Conn. App. 124,132-33 (1991), rev'd on other grounds, 221 Conn. 674
(1992). I find that the lockout in this situation very clearly violates the public policy of the state as expressed in statutory and common law; nothing more need be stated on the issue. I award punitive damages in the amount of $10,000.00 and reasonable attorney's fees in the amount of $4,500.00; the latter amount is computed by adding the bills presented at trial $2,077.50, with a CT Page 6379 reasonable fee for trial preparation and trial. On the counterclaim, then, the defendants have proved damages of $18,500.00.
Finally, as to the plaintiff's claim for attorney's fees, I have examined § 24.1 of the lease. This section allows for the payment of attorney's fees to a prevailing party. Although the plaintiff prevailed on some issues, it did not prevail as to many issues. I therefore do not award attorney's fees, nor do I award costs to either party.
Beach, J